UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA       :

      -v-                     :

MATTHEW IANNIELLO,             :
     a/k/a "Matty the Horse,"
CIRO PERRONE,                :
JOHN YANNUCCI,
SALVATORE ESPOSITO,          :
     a/k/a "Zookie,"
STEVE BUSCEMI,              :
MICHAEL DELUCA,
LEONARD CHETTI,            :
JULIUS BERNSTEIN,
     a/k/a "Spike,"          :
ANN CHIAROVANO,
SALVATORE BATTAGLIA,        :
DANIEL CILENTI,
MAURICE NAPOLI,           :
JOSEPH QUARANTA,
JOSEPH PICATAGGIO,         :
JOSEPH YANNUCCI,
     a/k/a "Augie,"          :
RALPH SCOPO, JR.,
FRANK AMBROSIO,           :
     a/k/a "Twinny,"
JOHN VITALE,              :
PAUL KAHL, and
JOHN AMBROSIO,            :

        Defendants.     :

- - - - - - - - - - - - - - - - - - -x

INDICTMENT

05 Cr.

# 05CRIM. 774



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUL 27 2005

## RACKETEERING CHARGES

### COUNT ONE

#### Racketeering Violation

The Grand Jury charges:

## The Enterprise

1.     At all times relevant to this Indictment, MATTHEW IANNIELLO, a/k/a "Matty the Horse," CIRO PERRONE, JOHN YANNUCCI, SALVATORE ESPOSITO, a/k/a "Zookie," STEVE BUSCEMI, MICHAEL DELUCA, LEONARD CHETTI, and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and others known and unknown, were members and associates of the Genovese Organized Crime Family of La Cosa Nostra (the "Genovese Organized Crime Family"). The Genovese Organized Crime Family was a criminal organization whose members and associates engaged in numerous acts of violence and other crimes, including murder; attempted murder; extortion; labor racketeering; the financing and making of extortionate extensions of credit and the collection of extensions of credit through extortionate means (commonly known as "loansharking"); robbery; and the operation of illegal gambling businesses.

2.     The Genovese Organized Crime Family, including its leadership, membership, and associates, constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) -- that is, a group of individuals associated in fact. This enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Genovese Organized Crime Family was an organized criminal group based in New York City that operated in the Southern District of New York and elsewhere and constituted an ongoing organization

2

whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.   The Genovese Organized Crime Family was referred to by its members and associates in various ways, including as a "cosa nostra," a "Family," and "this thing of ours."

3.   The Genovese Organized Crime Family was part of a nationwide criminal organization known by various names, including the "Mafia" and "La Cosa Nostra" ("LCN"), which operated through entities known as "Families."  The Genovese Organized Crime Family took its name from one of its early leaders, Vito Genovese.  In addition to the Genovese Organized Crime Family, five other Families operated in the New York City and New Jersey area, namely, the Gambino Organized Crime Family of LCN, the Luchese Organized Crime Family of LCN, the Colombo Organized Crime Family of LCN, the Bonanno Organized Crime Family of LCN, and the Decavalcante Organized Crime Family of LCN.

4.   The Genovese Organized Crime Family operated through groups of individuals known as "crews" and "regimes," most of which were based in New York City.  Each "crew" had as its leader a person known as a "Caporegime," "Capo," "Captain," or "Skipper," and consisted of "made" members, sometimes known as "Soldiers," "wiseguys," "friends of ours," and "good fellows." Soldiers were aided in their criminal endeavors by other trusted individuals, known as "associates," who sometimes were referred

3

to as "connected" or identified as "with" a Soldier or other member of the Family.  Associates participated in the various activities of the crew and its members.

5.    Each Capo was responsible for supervising the criminal activities of his crew and provided Soldiers and associates with support and protection.  In return, the Capo typically received a share of the illegal earnings of each of his crew's Soldiers and associates, which was sometimes referred to as "tribute."

6.    Above the Capos were the highest-ranking members of the Genovese Organized Crime Family, commonly referred to as the Administration.  The head of the Genovese Organized Crime Family was known as the "Boss," who was ordinarily assisted by an "Underboss" and a "Consigliere," or counselor.  The Boss, Underboss, and Consigliere were responsible for, among other things, setting policy, resolving disputes between and among members of the Genovese Organized Crime Family, and resolving disputes between members of the Genovese Organized Crime Family and members of other criminal organizations.  The Administration of the Genovese Organized Crime Family was also responsible for overseeing the criminal activities of the Family's Soldiers and associates, and was at times called upon to make decisions regarding those criminal endeavors.

4

7.    At various times relevant to this Indictment,
members of the Genovese Organized Crime Family were temporarily
appointed to serve as Boss, Underboss, Consigliere, or Capo in
place of another member holding that position.  Whenever this
occurred, the member holding the temporary appointment would
function in an "acting" capacity for the other member, who
continued to hold the "official" position in the Family.   In
addition, at various times relevant to this Indictment, members
of the Genovese Organized Crime Family served on a committee or
ruling panel, a group of high-ranking members of the Family who
assisted and, at times, made decisions with, or on behalf of, the
Boss and the Acting Boss of the Family.

8.    The Boss, Underboss, and Consigliere (whether
official or acting) and, at times, the members of the ruling
panel, supervised, supported, protected, and disciplined the
Capos, Soldiers, and associates, and regularly received reports
regarding their various activities.  In return for their
supervision and protection, the Boss, Underboss, and Consigliere
and members of the ruling panel typically received part of the
illegal earnings of each crew.

9.    While the overall structure of the Genovese
Organized Crime Family remained constant, the structure of the
Family's Administration was sometimes adjusted to meet situations
-- including particularly the incarceration of the Boss, Acting

5

Boss, and other high-ranking members of the Family -- that
threatened to impede the orderly operation and criminal
activities of the Genovese Organized Crime Family.  Accordingly,
at some point following the indictment and eventual incarceration
of the Boss of the Genovese Organized Crime Family, Vincent
Gigante, Genovese Organized Crime Family Capo MATTHEW IANNIELLO,
a/k/a "Matty the Horse," became an Acting Boss of the Genovese
Organized Crime Family.  IANNIELLO was one of several high-
ranking members of the Genovese Organized Crime Family to serve
as Acting Boss of the Family in the aftermath of Gigante's
incarceration.  At or about the same time that IANNIELLO became
an Acting Boss, Genovese Organized Crime Family Soldier CIRO
PERRONE became the Capo of IANNIELLO's former crew.

The Defendants

10.  At all times relevant to this Indictment, MATTHEW
IANNIELLO, a/k/a "Matty the Horse," CIRO PERRONE, JOHN YANNUCCI,
SALVATORE ESPOSITO, a/k/a "Zookie," STEVE BUSCEMI, MICHAEL
DELUCA, LEONARD CHETTI, and JULIUS BERNSTEIN, a/k/a "Spike," the
defendants, were members and associates of the enterprise, the
Genovese Organized Crime Family.  IANNIELLO, PERRONE, YANNUCCI,
ESPOSITO, BUSCEMI, DELUCA, CHETTI, and BERNSTEIN participated in
the operation and management of the enterprise as follows:

a.  MATTHEW IANNIELLO, a/k/a "Matty the Horse,"
the defendant, was, at various times relevant to this Indictment,

6

a Capo and Acting Boss of the Genovese Organized Crime Family.
As Acting Boss, IANNIELLO was responsible for, among other
things, supervising the illegal activities of all of the members
and associates of the Genovese Organized Crime Family and
resolving disputes with other Organized Crime Families.   In
particular, IANNIELLO regularly received a portion of the
proceeds generated from the illegal activities of the Genovese
Organized Crime Family.   In addition, IANNIELLO met with members
and associates of the Genovese Organized Crime Family to discuss
various criminal schemes.   Among IANNIELLO's criminal activities
were participation in extortions and labor racketeering.

          b.   CIRO PERRONE was, at various times relevant
to this Indictment, a Soldier and Capo in the Genovese Organized
Crime Family.   PERRONE became a Capo in the Genovese Organized
Crime Family at or about the time that MATTHEW IANNIELLO, a/k/a
"Matty the Horse," was elevated from Capo to Acting Boss.   In his
capacity as Capo, PERRONE supervised and profited from the
illegal activities of the Soldiers and associates in his crew.
PERRONE also oversaw a large-scale loansharking operation.
PERRONE regularly met with his crew and other LCN members and
associates at Don Peppe Restaurant in Ozone Park, New York, where
they discussed their criminal activities and matters related to
the operation of the Genovese Organized Crime Family.   Among
PERRONE's criminal activities were participation in obstruction

of justice, labor racketeering, loansharking, and the operation
of illegal gambling businesses.

          c.    JOHN YANNUCCI was, at various times relevant
to this Indictment, an associate of the Genovese Organized Crime
Family, in the crew supervised by CIRO PERRONE.  In this
capacity, among other things, YANNUCCI assisted PERRONE in the
operation of PERRONE's loansharking business and served as
PERRONE's personal driver.  Among YANNUCCI's criminal activities
were participation in obstruction of justice, loansharking, and
the operation of illegal gambling businesses.

          d.    SALVATORE ESPOSITO, a/k/a "Zookie," was, at
various times relevant to this Indictment, a Soldier in the
Genovese Organized Crime Family.  Among ESPOSITO's criminal
activities were participation in obstruction of justice, labor
racketeering, and the operation of illegal gambling businesses.

          e.    STEVE BUSCEMI was, at various times relevant
to this Indictment, an associate of the Genovese Organized Crime
Family, in the crew supervised by CIRO PERRONE.  Among BUSCEMI's
criminal activities were participation in loansharking.

          f.    MICHAEL DELUCA was, at various times relevant
to this Indictment, an associate and a proposed member of the
Genovese Organized Crime Family.  DELUCA was in the crew
supervised by CIRO PERRONE.  Among DELUCA's criminal activities
were participation in obstruction of justice and loansharking.

g.   LEONARD CHETTI was, at various times relevant to this Indictment, an associate of the Genovese Organized Crime Family in the crew supervised by CIRO PERRONE.  Among CHETTI's criminal activities were participation in loansharking.

h.   JULIUS BERNSTEIN, a/k/a "Spike," was, at various times relevant to this Indictment, an associate of the Genovese Organized Crime Family and a high-ranking official in Local 1181, Amalgamated Transit Union ("Local 1181").  BERNSTEIN was a long-time associate of MATTHEW IANNIELLO, a/k/a "Matty the Horse," and CIRO PERRONE.  BERNSTEIN and other officials at Local 1181 frequently consulted with and took direction from IANNIELLO and PERRONE with respect to matters involving Local 1181.  Among BERNSTEIN's criminal activities were participation in obstruction of justice, extortion, and labor racketeering.

### Purposes of the Enterprise

11.   The purposes of the enterprise included the following:

a.   Enriching the leaders, members, and associates of the enterprise through, among other things: (i) the extortionate control of businesses, labor unions, persons, and property through threats of physical and economic harm; (ii) labor racketeering; (iii) the making, financing, and collection of extortionate extensions of credit, commonly known as

9

"loansharking;" and (iv) the operation of illegal gambling
businesses;

          b.    Preserving and augmenting the power,
territory, and financial profits of the enterprise through
intimidation, violence, and threats of physical and economic
harm; and

          c.    Keeping victims and citizens in fear of the
enterprise and its leaders, members, and associates by: (i)
identifying the enterprise, its members, and its associates with
La Cosa Nostra or the "Mafia;" (ii) causing and threatening to
cause economic harm; and (iii) committing and threatening to
commit physical violence.

### Means and Methods of the Enterprise

      12.  Among the means and methods by which the
defendants and other enterprise members and associates conducted
and participated in the conduct of the affairs of the enterprise
were the following:

          a.    To protect and expand the enterprise's
business and criminal operations, members and associates of the
enterprise murdered, threatened to murder, and assaulted persons
who engaged in activity that jeopardized (i) the power and
criminal activities of the enterprise and the power and criminal
activities of fellow LCN Families, (ii) the power of leaders of

10

the enterprise, and (iii) the flow of criminal proceeds to the
leaders of the enterprise.

        b.    Members and associates of the enterprise
promoted a climate of fear in the community through threats of
economic harm and violence.

        c.    Members and associates of the enterprise
generated income for the enterprise through, among other things,
(i) extortion; (ii) labor racketeering; (iii) the operation of
illegal gambling businesses; and (iv) loansharking.

        d.    Members and associates of the enterprise at
times engaged in criminal conduct or coordinated their criminal
activities with leaders, members, and associates of other LCN
Families.  At other times, members and associates of the
enterprise met with leaders, members, and associates of other LCN
Families to resolve disputes over their criminal activities.

        e.    Members and associates of the enterprise
controlled various labor unions, including Local 1181 of the
Amalgamated Transit Union, and used their control over the unions
to obtain benefits for the enterprise.

        f.    Members and associates of the enterprise used
various techniques to avoid law enforcement scrutiny of the
enterprise's criminal activities.  Members and associates of the
enterprise typically used coded language to make arrangements for
meetings and to refer to other members and associates of the

enterprise, and took other steps to frustrate law enforcement's attempts to overhear their discussions. Members and associates of the enterprise also engaged in other evasive conduct, such as whispering and speaking in hushed tones in an effort to obstruct potential law enforcement eavesdropping, and not specifying the names of those about whom they were speaking. Members and associates of the enterprise also attempted to locate concealed recording equipment used by law enforcement officials to record their discussions and activities.

        g.   In order to frustrate investigations of their criminal conduct, members and associates of the enterprise attempted to, and did, obstruct justice by, among other things, meeting with individuals subpoenaed by federal grand juries and influencing the information that those individuals would provide to law enforcement authorities.

        h.   Members and associates of the enterprise attempted to identify and did identify individuals suspected of providing, or deemed likely to provide, information to law enforcement about the enterprise, its members and activities, and about other LCN Families.

        i.   To conceal their receipt of money generated from their criminal activities, members and associates of the enterprise concealed their ownership of various assets that were

purchased with proceeds of their criminal activities, including restaurants in the New York City area.

## The Racketeering Violation

13. From at least in or about the early 1990s, up through and including in or about July 2005, in the Southern District of New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the Horse," CIRO PERRONE, JOHN YANNUCCI, SALVATORE ESPOSITO, a/k/a "Zookie," STEVE BUSCEMI, MICHAEL DELUCA, LEONARD CHETTI, and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and others known and unknown, being persons employed by and associated with the racketeering enterprise described in Paragraphs 1 through 12 above, namely, the Genovese Organized Crime Family, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, willfully, and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), that is, through the commission of the following racketeering acts:

## The Pattern of Racketeering

14. The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

13

## **Racketeering Act One — Obstruction of Justice**

15.    The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act One:

a.    From in or about January 2005, up through and including in or about June 2005, in the Southern District of New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the Horse," CIRO PERRONE, JOHN YANNUCCI, SALVATORE ESPOSITO, a/k/a "Zookie," and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to corruptly obstruct, influence, and impede an official proceeding, in violation of Title 18, United States Code, Section 1512(c) and (k).

b.    From in or about January 2005, up through and including in or about June 2005, in the Southern District of New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the Horse," CIRO PERRONE, JOHN YANNUCCI, SALVATORE ESPOSITO, a/k/a "Zookie," and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and others known and unknown, unlawfully, willfully, and knowingly did corruptly obstruct, influence, and impede an official proceeding, and did attempt to do so, to wit, the defendants attempted to and did obstruct, influence, and impede an investigation of a federal grand jury in the Southern District of New York by, among other

things, providing false, misleading, and incorrect information
regarding the involvement of the Genovese Organized Crime Family
in the affairs of Local 1181 of the Amalgamated Transit Union, in
violation of Title 18, United States Code, Sections 1512(c) and
2.

### Racketeering Act Two — Extortion and Labor Racketeering

16.   The defendants named below committed the following
acts of racketeering, any one of which alone constitutes the
commission of Racketeering Act Two:

a.   In or about 1997, in the Southern District of
New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the
Horse," and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and
others known and unknown, unlawfully, willfully, and knowingly
did combine, conspire, confederate, and agree together and with
each other to commit extortion, as that term is defined in Title
18, United States Code, Section 1951(b)(2), by obtaining money
and property from and with the consent of another person, to wit,
the owners and operators of a medical center located in Jamaica,
New York, which consent would have been and was induced by the
wrongful use of actual and threatened force, violence, and fear,
and thereby would and did obstruct, delay, and affect commerce
and the movement of articles and commodities in commerce, as that
term is defined in Title 18, United States Code, Section

15

1951(b)(3), in violation of Title 18, United States Code, Section
1951.

    b. In or about 1997, in the Southern District of
New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the
Horse," and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and
others known and unknown, unlawfully, willfully, and knowingly
did commit extortion, and did attempt to commit extortion, as
that term is defined in Title 18, United States Code, Section
1951(b)(2), by obtaining money and property from and with the
consent of another person, to wit, the owners and operators of a
medical center located in Jamaica, New York, which consent was
induced by the wrongful use of actual and threatened force,
violence, and fear, and thereby did obstruct, delay, and affect
commerce and the movement of articles and commodities in
commerce, as that term is defined in Title 18, United States
Code, Section 1951(b)(3), to wit, with the backing of IANNIELLO,
BERNSTEIN demanded and received a cash payment of approximately
$100,000 from the tenants of office space leased by Local 1181 —
namely, the owners and operators of a medical center in Jamaica,
New York — in exchange for Local 1181's approval on a renewal of
the medical center's lease, in violation of Title 18, United
States Code, Sections 1951 and 2.

    c. In or about 1997, in the Southern District of
New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the

Horse," and JULIUS BERNSTEIN, a/k/a "Spike," the defendants,
knowing that BERNSTEIN was an officer, agent, and employee of an
employee organization whose members were covered by an employee
welfare benefit plan, to wit, the Division 1181 A.T.U. — New York
Welfare Fund, unlawfully, willfully, and knowingly, received and
agreed to receive and solicited a fee, kickback, commission,
gift, loan, money, and thing of value because of and with the
intent to be influenced with respect to BERNSTEIN's actions,
decisions, and other duties relating to a question and matter
concerning such plan, to wit, with the backing of IANNIELLO,
BERNSTEIN demanded and received a cash payment of approximately
$100,000 from the tenants of office space leased by Local 1181 —
namely, the owners and operators of a medical center in Jamaica,
New York, which provided medical care to participants of the
Division 1181 A.T.U. — New York Welfare Fund — in exchange for
Local 1181's approval on a renewal of the medical center's lease,
in violation of Title 18, United States Code, Sections 1954 and
2.

### Racketeering Act Three — Extortion and Labor Racketeering

17.  The defendants named below committed the following
acts of racketeering, any one of which alone constitutes the
commission of Racketeering Act Three:

a.    From in or about 1997, up through and
including in or about July 2005, in the Southern District of New

17

York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the Horse,"
and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and others
known and unknown, unlawfully, willfully, and knowingly did
combine, conspire, confederate, and agree together and with each
other to commit extortion, as that term is defined in Title 18,
United States Code, Section 1951(b)(2), by obtaining money and
property from and with the consent of another person, to wit, the
owners and operators of a medical center located in Jamaica, New
York, which consent would have been and was induced by the
wrongful use of actual and threatened force, violence, and fear,
and thereby would and did obstruct, delay, and affect commerce
and the movement of articles and commodities in commerce, as that
term is defined in Title 18, United States Code, Section
1951(b)(3), in violation of Title 18, United States Code, Section
1951.

          b.    From in or about 1997, up through and
including in or about July 2005, in the Southern District of New
York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the Horse,"
and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, and others
known and unknown, unlawfully, willfully, and knowingly did
commit extortion, and did attempt to commit extortion, as that
term is defined in Title 18, United States Code, Section
1951(b)(2), by obtaining money and property from and with the
consent of another person, to wit, the owners and operators of a

18

medical center located in Jamaica, New York, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, with the backing of IANNIELLO, BERNSTEIN demanded and received regular cash payments from the tenants of office space leased by Local 1181 — namely, the owners and operators of a medical center in Jamaica, New York, in violation of Title 18, United States Code, Sections 1951 and 2.

c.     From in or about 1997, up through and including in or about July 2005, in the Southern District of New York and elsewhere, MATTHEW IANNIELLO, a/k/a "Matty the Horse," and JULIUS BERNSTEIN, a/k/a "Spike," the defendants, knowing that BERNSTEIN was an officer, agent, and employee of an employee organization whose members were covered by an employee welfare benefit plan, to wit, the Division 1181 A.T.U. — New York Welfare Fund, unlawfully, willfully, and knowingly, received and agreed to receive and solicited a fee, kickback, commission, gift, loan, money, and thing of value because of and with the intent to be influenced with respect to BERNSTEIN's actions, decisions, and other duties relating to a question and matter concerning such plan, to wit, with the backing of IANNIELLO, BERNSTEIN demanded and received regular cash payments from the tenants of office

19

space leased by Local 1181 — namely, the owners and operators of a medical center in Jamaica, New York, which provided medical care to participants of the Division 1181 A.T.U. — New York Welfare Fund, in violation of Title 18, United States Code, Sections 1954 and 2.

**Racketeering Act Four - Operation of an Illegal Gambling Business**

18.    From at least in or about 2003, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE, JOHN YANNUCCI, and SALVATORE ESPOSITO, a/k/a "Zookie," the defendants, and others known and unknown, unlawfully, willfully, and knowingly conducted, financed, managed, supervised, directed, and owned all and part of an illegal gambling business, namely, a large-scale illegal card game operation, in violation of New York State Penal Law Sections 225.00 and 225.10, and which business involved five and more persons who conducted, financed, managed, supervised, directed, and owned all and part of it, and which business had been and remained in substantially continuous operation for a period in excess of thirty days and had gross revenues of $2,000 in a single day, in violation of Title 18, United States Code, Sections 1955 and 2.

**Racketeering Act Five – Loansharking Conspiracy**

19.   The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Five:

a.   From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE, JOHN YANNUCCI, STEVE BUSCEMI, MICHAEL DELUCA, and LEONARD CHETTI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to make extortionate extensions of credit, as that term is defined in Title 18, United States Code, Section 891, to wit, the defendants and others operated a large-scale loansharking business, in violation of Title 18, United States Code, Section 892.

b.   From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE, JOHN YANNUCCI, STEVE BUSCEMI, MICHAEL DELUCA, and LEONARD CHETTI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to participate in the use of extortionate means to collect and attempt to collect extensions of credit from debtors, and to punish such people for the non-repayment of said

21

extensions of credit, as those terms are defined in Title 18, United States Code, Sections 891(5) and 891(7), in violation of Title 18, United States Code, Section 894.

### Racketeering Act Six - Loansharking: Victim #1

20.    The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Six:

a.    From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE, JOHN YANNUCCI, and STEVE BUSCEMI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did make an extortionate extension of credit, as that term is defined in Title 18, United States Code, Section 891, to wit, the defendants and others made an extortionate loan to a victim not named herein ("Victim #1"), the owner of a restaurant in Howard Beach, New York, in violation of Title 18, United States Code, Sections 892 and 2.

b.    From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE, JOHN YANNUCCI, and STEVE BUSCEMI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did participate in the use of extortionate means to collect and attempt to collect extensions of credit from a person, and to punish such person for

22

the non-repayment of said extensions of credit, as those terms are defined in Title 18, United States Code, Sections 891(5) and 891(7), to wit, the defendants and others participated in the use of extortionate means to collect an extension of credit that they made to Victim #1, in violation of Title 18, United States Code, Sections 894 and 2.

### Racketeering Act Seven - Loansharking: Victim #2

21.   The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Seven:

a.   From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE and JOHN YANNUCCI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did make an extortionate extension of credit, as that term is defined in Title 18, United States Code, Section 891, to wit, the defendants and others made an extortionate loan to a victim not named herein ("Victim #2"), in violation of Title 18, United States Code, Sections 892 and 2.

b.   From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE and JOHN YANNUCCI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did participate in the use of extortionate means to

collect and attempt to collect extensions of credit, and to punish such person for the non-repayment of said extensions of credit, as those terms are defined in Title 18, United States Code, Sections 891(5) and 891(7), to wit, the defendants and others participated in the use of extortionate means to collect an extension of credit that they made to Victim #2, in violation of Title 18, United States Code, Sections 894 and 2.

### Racketeering Act Eight - Loansharking: Victim #3

22.   The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Eight:

a.   From at least in or about 2004, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE and JOHN YANNUCCI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did make an extortionate extension of credit, as that term is defined in Title 18, United States Code, Section 891, to wit, the defendants and others made an extortionate loan to a victim not named herein ("Victim #3"), in violation of Title 18, United States Code, Sections 892 and 2.

b.   From at least in or about 2004, up through and including in or about July 2005, in the Southern District of New York and elsewhere, CIRO PERRONE and JOHN YANNUCCI, the defendants, and others known and unknown, unlawfully, willfully,

and knowingly did participate in the use of extortionate means to collect and attempt to collect extensions of credit, and to punish such person for the non-repayment of said extensions of credit, as those terms are defined in Title 18, United States Code, Sections 891(5) and 891(7), to wit, the defendants and others participated in the use of extortionate means to collect an extension of credit that they made to Victim #3, in violation of Title 18, United States Code, Sections 894 and 2.

### Racketeering Act Nine - Loansharking: Victim #4

23.    The defendants named below committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Nine:

a.    From at least in or about 2000, up through and including in or about July 2005, in the Southern District of New York and elsewhere, JOHN YANNUCCI, MICHAEL DELUCA, STEVE BUSCEMI, and LEONARD CHETTI, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did make an extortionate extension of credit, as that term is defined in Title 18, United States Code, Section 891, to wit, the defendants and others made an extortionate loan to a victim not named herein ("Victim #4"), in violation of Title 18, United States Code, Sections 892 and 2.

b.    From at least in or about 2000, up through and including in or about July 2005, in the Southern District of