UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION        :

OF THE UNITED STATES OF AMERICA        :

FOR ORDERS AUTHORIZING THE             :        AFFIDAVIT IN SUPPORT
                                                OF APPLICATIONS FOR
INTERCEPTION OF ORAL COMMUNICATIONS :            ORDERS AUTHORIZING
                                                THE INTERCEPTION OF
AND VISUAL NON-VERBAL CONDUCT          :        ORAL COMMUNICATIONS
                                                AND VISUAL NON-VERBAL
OCCURRING AT AND AROUND THE LARGE      :        CONDUCT_____

ROUND TABLE INSIDE AND AT THE REAR     :

OF DON PEPPE RESTAURANT,               :

135-58 LEFFERTS BOULEVARD, OZONE       :

PARK, NEW YORK.                        :

- - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK          )
NEW YORK COUNTY            :  ss.:
SOUTHERN DISTRICT OF NEW YORK )

        JOHN   PENZA,   Special   Agent,   Federal   Bureau   of
Investigation ("FBI"), being duly sworn, states:

## I. **INTRODUCTION**

        1.    I am an "investigative or law enforcement officer
. . . of the United States" within the meaning of Section 2510(7)
of Title 18, United States Code, that is, an officer of the United
States who is empowered by law to conduct investigations of and to
make arrests for offenses enumerated in Section 2516 of Title 18,
United States Code.

        2.    This affidavit is being submitted in support of an

application for an order, pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of oral communications occurring AT AND AROUND THE LARGE ROUND TABLE INSIDE AND AT THE REAR OF DON PEPPE RESTAURANT, 135-58 LEFFERTS BOULEVARD, OZONE PARK, NEW YORK (hereinafter referred to as "THE TABLE").[1]  This affidavit is also being submitted in support of an application for an order pursuant to Section 1651 of Title 28, United States Code (the All Writs Act), and Rule 41(b) of the Federal Rules of Criminal Procedure, authorizing the interception and recording of visual non-verbal conduct, by means of closed circuit television cameras, occurring at and around THE TABLE.

3.    The orders referenced in Paragraph 2 above are requested for a thirty (30) day period concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is offenses involving:

(a)    racketeer influenced and corrupt organizations ("RICO"), in violation of Section 1962(c) and punishable under Section 1963 of Title 18, United States Code, and conspiring to commit said offense, in violation of Section 1962(d) of Title 18, United States Code, that is, that the persons described in Paragraph 6 below are employed by and associated with, and conduct the affairs of, an "enterprise" as defined in Section 1961(4) of

---

[1] A sketch of the interior of Don Peppe restaurant, including the specific location of THE TABLE, is attached hereto as Exhibit A.

2

Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the Genovese Organized Crime Family of La Cosa Nostra ("LCN"), which enterprise is engaged in and the activities of which affect interstate and foreign commerce through a pattern of racketeering activity consisting of the criminal violations set forth in paragraphs 3(b)-(d), infra;

(b) obtaining, attempting to obtain and conspiring to obtain money and property from and with the consent of the owners and operators of various commercial businesses, including restaurants, which consent is and would be induced by the wrongful use of actual and threatened force, violence and fear, and thereby would and did affect interstate commerce, in violation of Title 18, United States Code, Sections 1951 and 2;

(c) making, financing, and collecting extortionate extensions of credit, and conspiring to make, finance and collect extortionate extensions of credit, more commonly known as "loansharking," in violation of Title 18, United States Code, Sections 892, 893 and 894; and

(d) conducting, financing, managing, supervising, directing, and owning all or part of an illegal gambling business, in violation of Title 18, United States Code, Section 1955.

4. I have been employed as a Special Agent of the FBI for approximately four years. I am presently assigned to a task

3

force (the "Task Force") comprised of Special Agents of the FBI and Detectives of the New York City Police Department ("NYPD") who have been sworn as Special Federal Officers.  Our principal responsibility is to investigate the illegal activities of LCN in the New York City area and, specifically, criminal activity involving members and associates of the Genovese Organized Crime Family of LCN.

5.    I personally have participated in the investigation of the offenses referred to in Paragraph 3 above, and, from my personal participation in this investigation and from oral and written reports of other FBI agents, as well as officers of other law enforcement agencies, I am familiar with the facts and circumstances of this investigation.  Based upon this knowledge, I allege the facts in the paragraphs below to demonstrate that:

### A.    Subjects and Offenses

6.    There is probable cause to believe that MATTHEW IANNIELLO,  a/k/a  "Matty the Horse;" CIRO PERRONE; SALVATORE ESPOSITO, a/k/a "Zookie;" FRANK CATENACCIO, a/k/a "Frankie," a/k/a "Frankie Cee;" JOHN YANNUCCI; ANTHONY CONIGLIARO; ONOFRIO MACCHIO; ANTHONY ANTICO, a/k/a "Tico;" JOHN GIGLIO, a/k/a "John Digiglio;" JOHN A. BRESCIO, a/k/a "Johnny Hollywood;" LOUIS CALO; RALPH SCOPO, JR.; FRANK STURIANO; GEORGE REMINI; MICHAEL CORCIONE; ALEX TISI; BOBBY (LNU); and JOHN BAUDANZA (the "SUBJECTS"), and others as yet unknown, have committed, are committing, and will continue to commit offenses involving racketeer influenced and corrupt

4

325

organizations, in violation of Section 1962(c) and punishable under Section 1963 of Title 18, United States Code, and conspiring to commit said offenses in violation of Section 1962(d) of Title 18, United States Code, in that the SUBJECTS, and others as yet unknown, are employed by and associated with, and conduct the affairs of, an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the Genovese Organized Crime Family of LCN, the activities of which affect interstate and foreign commerce through a pattern of racketeering activity consisting of the following offenses:

(a)  obtaining, attempting to obtain and conspiring to obtain money and property from and with the consent of the owners and operators of various commercial businesses, including restaurants and construction companies, which consent is and would be induced by the wrongful use of actual and threatened force, violence and fear, and thereby would and did affect interstate commerce, in violation of Title 18, United States Code, Sections 1951 and 2;

(b)  making, financing, and collecting extortionate extensions of credit, and conspiring to make, finance and collect extortionate  extensions of credit, more commonly known as "loansharking," in violation of Title 18, United States Code, Sections 892, 893, and 894; and

5

(c)  conducting, financing, managing, supervising, directing, and owning all or part of an illegal gambling business, in violation of Title 18, United States Code, Section 1955.

## B.  Designated Premises

7.    There is probable cause to believe that the THE TABLE has been used by, is presently being used by, is commonly used by, and will be used during the period of interception applied for herewith by the SUBJECTS, and others as yet unknown, in order to accomplish, to discuss, and to commit the offenses described in Paragraph 3 above.[2]

8.    As reflected in the sketch attached hereto as Exhibit A, THE TABLE is located at the rear of a commercial restaurant that is open to the public.  THE TABLE is located inside the restaurant in a rear corner adjacent to an area within the restaurant that contains tables in a large seating area.  Physical surveillance to date indicates that the SUBJECTS most frequently meet and hold conversations at THE TABLE on Tuesdays and Thursdays between the approximate times of 4:00 p.m. and 10:00 p.m.[3]  This meeting pattern of the SUBJECTS at THE TABLE has been confirmed by confidential sources.  Physical surveillance also has revealed that

---

[2] Additionally, although not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the SUBJECTS have aided and abetted, and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

[3] In the event the SUBJECTS' meeting pattern changes, the Government will continue to intercept the SUBJECTS' communications at and around THE TABLE and will apprise the Court immediately.

6

THE TABLE is infrequently used by customers other than the SUBJECTS when the SUBJECTS are inside the Don Peppe restaurant. Based on this confirmed pattern of activity, the Government is seeking authorization to intercept the SUBJECTS' oral communications at and around THE TABLE between the approximate hours of 4:00 p.m. and 10:00 p.m. on Tuesdays and Thursdays. Even during this limited period of interception, members of the Task Force will use all best efforts to discontinue interception of oral communications when none of the SUBJECTS is present inside the Don Peppe restaurant.

C.   **Objectives**

9.   There is probable cause to believe that intercepted oral communications of the SUBJECTS occurring at THE TABLE and concerning the above offenses will be obtained and will reveal:

(a) the nature, scope, extent, and method of operation of the enterprise known as the Genovese Organized Crime Family of LCN, with which the SUBJECTS, and others as yet unknown, are associated in fact, and the affairs of which they are unlawfully conducting and conspiring to conduct through a pattern of racketeering activity;

(b) the identities and roles of accomplices, aiders and abettors, co-conspirators, and other participants in, and the victims of the illegal activities of the enterprise referred to in Paragraph 3 above, specifically, the identities of those persons committing or conspiring to commit racketeering offenses, the extortion of the owners and operators of various commercial

7

328

businesses, loansharking, and illegal gambling;

(c)  the receipt and distribution of contraband, money, and other proceeds resulting from those illegal activities;

(d)  the existence and location of items used to further those illegal activities;

(e)  the existence and location of records used to record the receipt of proceeds of those illegal activities; and

(f)  the location and source of resources used to finance those illegal activities.

10.  In addition, these intercepted oral communications and visual non-verbal conduct are expected to constitute admissible evidence of the commission of the offenses described in Paragraph 3 above.

**D.   Alternative Investigative Techniques**

11.  Alternative investigative techniques have been tried without success, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ.  See ¶ 39, infra.

**E.   Prior Applications**

12.  I have been informed that a review of the electronic surveillance indexes of the FBI (conducted on or about September 17, October 15, October 18, and October 28, 2004), Drug Enforcement Administration (conducted on or about September 20 and October 15, 2004), and Immigration and Customs Enforcement

8

(conducted on or about September 21 and October 15, 2004) pertaining to the SUBJECTS and THE TABLE, did not reveal any prior applications except as set forth below:

(a) On or about June 23, 1980, MATTHEW IANNIELLO was named in an order issued by United States District Judge William Matthew Byrne, Jr., Central District of California, authorizing the interception of wire and/or oral communications involving IANNIELLO. Because of the age of the order, FBI indices have no further identifying information. A good-faith effort was made to review the case files, which have been closed and kept in storage for over a decade. The search, however, revealed no further information.

(b) Between on or about September 7, 1982, and on or about December 27, 1982, "Matthew Ianiello" (identified herein as MATTHEW IANNIELLO) was named in six orders issued by United States District Judges in the Southern District of New York, all authorizing the interception of oral communications involving IANNIELLO. Because of the age of the orders, FBI indices have no further identifying information. A good-faith effort was made to review the case files, which have been closed and kept in storage for over a decade. The search, however, revealed no further information.

(c) In and around February 1983, "Matthew Ianiello" (identified herein as MATTHEW IANNIELLO) was named in two orders issued by United States District Judges in the Southern District of

9

330

New York, authorizing both the interception of wire and/or oral communications involving IANNIELLO.  Because of the age of the orders, FBI indices have no further identifying information.  A good-faith effort was made to review the case files, which have been closed and kept in storage for over a decade.  The search, however, revealed no further information.

(d) On or about April 13, 1989, the Honorable Morris Lasker, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire or oral communications involving ONOFRIO MACCHIO.  Judge Lasker re-authorized the interception of wire or oral communications involving MACCHIO and others on or about May 16, 1989; June 15, 1989; July 11, 1989; August 9, 1989; September 8, 1999; October 5, 1989; November 2, 1989; November 25, 1989; and December 21, 1989.

(e) On or about August 3, 1989, the Honorable Michael B. Mukasey, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire or oral communications involving ONOFRIO MACCHIO.

(f) On or about May 13, 1993, the Honorable John F. Keenan, United States District Judge for the Southern District of New York, issued an order authorizing the interception of oral communications involving SALVATORE ESPOSITO.  The FBI never executed this order.

(g) On or about December 20, 1993, the Honorable Lawrence M. McKenna, United States District Judge for the Southern

District of New York, issued an order authorizing the interception of oral communications involving SALVATORE ESPOSITO and others. The FBI installed the listening device, but it was never activated.

(h) On or about January 24, 1994, the Honorable John E. Sprizzo, United States District Judge for the Southern District of New York, issued an order authorizing the interception of oral communications involving SALVATORE ESPOSITO and others.  Judge Sprizzo re-authorized the interception of oral communications involving ESPOSITO and others on or about February 25, 1994, and on or about March 29, 1994.

(i) On or about March 14, 1994, the Honorable Thomas P. Griesa, United States District Judge for the Southern District of New York, issued an order authorizing the interception of oral communications involving SALVATORE ESPOSITO and others.

(j) On or about August 23, 1994, the Honorable Sonya Sotomayor, then-United States District Judge for the Southern District of New York, issued orders authorizing the interception of wire or oral communications involving ANTHONY CONIGLIARO.  Judge Sotomayor re-authorized the interception of wire or oral communications involving ANTHONY CONIGLIARO on or about September 23, 1994; October 31, 1994; December 1, 1994; and January 9, 1995.

(k) On or about November 8, 1994, the Honorable Milton Pollack, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire communications involving SALVATORE ESPOSITO and others.

11

332

Judge Pollack re-authorized the interception of wire communications involving ESPOSITO and others on or about December 7, 1994; January 19, 1995; February 21, 1995; and March 31, 1995.

(l) On or about June 23, 1997, the Honorable Kevin Thomas Duffy, United States District Judge for the Southern District of New York, issued orders authorizing the interception of wire or oral communications involving JOHN GIGLIO and others. Judge Duffy re-authorized the interception of wire or oral communications involving JOHN GIGLIO on or about July 24, 1997; August 26, 1997; September 30, 1997; November 5, 1997; December 8, 1997; January 9, 1998; and February 9, 1998.

(m) On or about December 8, 1997, the Honorable Sonya Sotomayor, then-United States District Judge for the Southern District of New York, issued orders authorizing the interception of wire communications involving JOHN BAUDANZA and others. Judge Sotomayor re-authorized the interception of wire communications involving JOHN BAUDANZA and others on or about January 9, 1998, and February 9, 1998.

(n) On or about January 24, 2002, the Honorable I. Leo Glasser, United States District Judge for the Eastern District of New York, issued orders authorizing the interception of wire communications involving JOHN BAUDANZA. Judge Glasser re-authorized the interception of wire communications involving JOHN BAUDANZA and others on or about January 29, 2002; February 28, 2002; April 1, 2002; May 1, 2002; May 8, 2002; May 21, 2002; June

12

4, 2002; and July 18, 2002.

(o) On or about January 24, 2002, the Honorable I. Leo Glasser, United States District Judge for the Eastern District of New York, issued orders authorizing the interception of wire communications involving MICHAEL CORCIONE and others on or about January 24, 2002. Judge Glasser re-authorized the interception of wire communications involving MICHAEL CORCIONE on or about February 28, 2002.

(p) On or about April 12, 2002, the Honorable Nina Gershon, United States District Judge for the Eastern District of New York, issued an order authorizing the interception of wire communications involving JOHN BAUDANZA.

(q) On or about July 22, 2002, the Honorable Allyne R. Ross, United States District Judge for the Eastern District of New York, issued an order authorizing the interception of wire communications involving JOHN BAUDANZA and others. Judge Ross re-authorized the interception of wire communications involving JOHN BAUDANZA and others on or about August 29, 2002. On or about November 4, 2002, Judge Ross issued an order authorizing the interception of wire communications involving JOHN BAUDANZA and others, and Judge Ross re-authorized that interception on or about December 6, 2002. On or about February 3, 2003, Judge Ross issued another order authorizing the interception of wire communications involving JOHN BAUDANZA and others.

(r) On or about August 5, 2002, the Honorable

13

334

Nicholas G. Garaufis, United States District Judge for the Eastern District of New York, issued an order authorizing the interception of wire communications involving JOHN BAUDANZA.

(s) On or about January 23, 2003, the Honorable Colleen McMahon, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire communications involving "Matthew Ianiello" (identified herein as MATTHEW IANNIELLO).

(t) On or about March 28, 2003, the Honorable Raymond J. Dearie, United States District Judge for the Eastern District of New York, issued an order authorizing the interception of wire communications involving MICHAEL CORCIONE, JOHN BAUDANZA, and others.

14

335

F.    **Factual Basis**

13.    The facts comprising the basis for this affidavit
are derived from the following sources:

(a)    information provided by confidential sources
and cooperating witnesses to Special Agents of the FBI;

(b)    testimony    at    federal    racketeering    trials
involving members and associates of LCN;

(c)    interceptions    of    oral    communications    of
IANNIELLO    and    other    members    and    associates of the Genovese
Organized    Crime    Family    pursuant    to    a    separate    court-authorized
Title III order;

(d)    physical    surveillance    conducted    by    law
enforcement officers, including me; and

(e)    independent    investigation by law enforcement
officers, including me.

14.    Unless otherwise noted, whenever I set forth a

15

336

statement by a confidential source or cooperating witness, the source or witness spoke either directly to me or to another law enforcement officer, who thereafter communicated such information to me. Unless otherwise noted, all statements set forth herein that are attributed to confidential sources or other witnesses are stated only in substance and in part. In addition, unless otherwise noted, information set forth herein concerning physical surveillance is based on my own participation in the surveillance or was communicated to me by other FBI agents or other law enforcement officers who conducted such surveillance. Because this affidavit is being submitted for the limited purpose of securing authorization for the interception of oral communications, I have not included each and every fact that I have learned during this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the orders sought herein.

## II. **PROBABLE CAUSE**

### A.    **Background**

15.    I am familiar with the numerous investigations conducted by the FBI and NYPD into the illegal activities of the Genovese Organized Crime Family and other LCN Families.  I also am familiar with the facts underlying the racketeering convictions in the United States District Court for the Southern District of New York of numerous defendants in <u>United States</u> v. <u>Salerno</u>, 868 F.2d 524 (2d Cir. 1989) (the "Commission Case").  The results of these

16

investigations and the evidence at the trial of the Commission Case demonstrated beyond a reasonable doubt the following facts pertinent to this investigation:

(a)  LCN is a secret, nationwide, criminal society that operates through local organizations known as "Families."

(b)  In New York City, there are five LCN Families: the Genovese, Gambino, Colombo, Luchese, and Bonanno Families. Each Family is engaged in a wide variety of criminal activities, including, <u>inter alia</u>, murder, gambling, loansharking, narcotics trafficking, extortion, racketeering, and the corrupt infiltration of legitimate businesses.

(c)  LCN Families operate through a hierarchical structure.  In descending order of power, the following positions exist within each LCN Family: "boss;" "underboss;" "<u>consigliere</u>" or counselor; "capo;" and "soldier."  A soldier is sometimes referred to as a "wiseguy," a "member," or a "made guy."  Typically, soldiers work in groups known as "crews," under the direction of a <u>caporegime</u>, or capo.  A capo is sometimes referred to as a "captain" or "skipper."  Members of LCN Families are aided in their illegal endeavors by trusted non-members of LCN, who are referred to as "associates."

(d)  From time to time, an LCN Family may propose a list of associates to be "made," that is, to become members of that LCN Family.  The list is circulated for approval to the other LCN Families based in New York City.  Upon becoming "made," each

17

338

member takes an oath of <u>omerta</u>, that is, a vow never to reveal any information about the LCN Family, its members, or its associates.

## B.   THE TABLE

16.   As noted in Paragraphs 7 and 8 above, and as described more fully in the paragraphs below, there is probable cause to believe that the SUBJECTS, and others known and unknown, are discussing, planning, and participating in the illegal activities of the racketeering enterprise described in Paragraph 3 above, at THE TABLE.   The use of THE TABLE by the SUBJECTS and others is established by information provided by cooperating witnesses and confidential sources, and from the physical surveillances that other FBI agents and I have conducted during this investigation and that are summarized below.   Although the SUBJECTS are the only interceptees named herein for THE TABLE, the Court will be notified promptly if (a) any other individual with whom the SUBJECTS meet at or around THE TABLE engages in criminal conduct and/or criminal conversations, and (b) these persons are identified fully.

## C.   The Subjects

17.   MATTHEW IANNIELLO, SALVATORE ESPOSITO, and CIRO PERRONE have been made members in the Genovese Organized Crime Family for many years.   They are 84, 73, and 83 years of age, respectively.   IANNIELLO is well known within the ranks of Organized Crime and is considered a very powerful, respected, and influential member of the Genovese Organized Crime Family.   FBI

sources report that IANNIELLO is currently the "Acting Boss" of the Genovese Organized Crime Family. [4] FBI records have listed IANNIELLO as a capo in the Genovese Organized Crime Family for approximately twenty years. ESPOSITO, PERRONE, and FRANK CATENACCIO have been trusted associates to IANNIELLO and members of his crew during that time. In 1987, IANNIELLO began serving a federal prison sentence based on a conviction for income tax evasion. While IANNIELLO served his prison sentence, IANNIELLO'S crew was run by James Ida[5] and subsequently by ESPOSITO. IANNIELLO was released from prison in 1995 and finished his probation in 2001. Sources report that IANNIELLO is again active and engaged in illegal activity and decision-making at the highest levels of the Genovese Organized Crime Family. [6] Due to IANNIELLO's elevated status in the Genovese Organized Crime Family, PERRONE is currently acting as the capo of IANNIELLO's crew.[7]

    18. Historically, IANNIELLO and his crew have met to discuss and conduct illegal business at various locations on Mulberry Street in Little Italy in Manhattan. For approximately twenty years, sources have reported that IANNIELLO and his crew were involved in, among other illegal activities, gambling,

---

[4] See paragraphs 20, 23, 26, supra.

[5] Ida, who ultimately achieved the rank of consigliere for the Genovese Organized Crime Family, is currently serving a life sentence in federal prison for a murder conviction, among other charges in the Southern District of New York.

[6] See paragraphs 20, 23, 27, supra.

[7] See paragraphs 20, 23, supra.

19

340

loansharking, extortion, and murder.[8]  IANNIELLO was also involved
in businesses involving exotic dancers.  IANNIELLO has owned, and
currently owns through various front-men, restaurants in New York
City.  He and ESPOSITO at one time controlled, through extortion,
all of the booths on Mulberry Street from Canal to Grand Streets,
during the San Gennaro Feast in Little Italy, Manhattan.[9]  In 1997,
James Ida, Thomas Cestaro, John Schenone (a close associate of
ESPOSITO), and a number of additional made members and associates
of the Genovese Organized Crime Family pled guilty to, or were
convicted at trial of, engaging in extortionate activity in
relation to the San Gennaro Feast.  According to sources, IANNIELLO
and members of his crew continue to have influence in the
activities of the San Gennaro Feast.[10]

        19.  A confidential source (hereinafter "CS-1") has been
providing information to the FBI for approximately four years. [11]
The FBI has independently corroborated, to the extent possible, the

---

[8] See also ¶¶ 19-20, 23-24, 26, infra.

[9] See note 10, supra.

[10] Until recently, CATENACCIO'S sister, Vivian Catenaccio,
served as the acting president of the Figli di San Gennaro, Inc.,
the non-profit organization that runs the famous Little Italy
feast.  As a result of recent negative articles in the New York
City press, Vivian Catenaccio stepped down from the position and
removed herself from the organization, in which she had also been
the long-serving secretary and vice-president.  See also
paragraph 27, infra.

[11] CS-1 has provided information that has been used to
support one prior Title III affidavit and one search warrant
affidavit.

information that CS-1 has provided, and CS-1 has never been found to be untruthful in any material respect.  CS-1's information relevant to the instant application is summarized below and is based on CS-1's personal knowledge, as well as on conversations that CS-1 has had with members and associates of the Genovese Organized Crime Family.[12]

        20.   In or about June and July 2004, CS-1 reported that IANNIELLO is the "Acting Boss" of the Genovese Organized Crime Family.  This means that IANNIELLO is effectively responsible for running the operations of the Genovese Organized Crime Family while other leaders of the Family are serving prison sentences.  CS-1 advised that the following individuals are members of IANNIELLO'S crew: ESPOSITO, CIRO LNU, CATENACCIO, Bobby LNU, Alex Tisi, and unknown others.[13]  According to CS-1, PERRONE, ESPOSITO and CATENACCIO are made members of the Genovese Organized Crime Family.  PERRONE and ESPOSITO are currently running the crew and handling the crew's day-to-day business on IANNIELLO's behalf.  CATENACCIO is involved in gambling and loansharking.[14]  "Bobby LNU" is

_____

    [12] In the past, CS-1 has engaged in various criminal activity with members and associates of LCN.

    [13] CS-1 did not know "CIRO's" last name.  However, "CIRO" is believed to be CIRO PERRONE.

    [14] "Loansharking" is the practice of loaning money at usurious interest rates where the repayment of such loans is enforced by the implied threat or actual use of physical violence or economic harm. Typically, crew members "kick up" money to the leader of the crew (capo or acting capo).  The money, also referred to as "tribute," is generally a portion of the profits that crew members earn while engaged in illegal activity.  This

21

involved in construction in New York City and has business interests in Florida. ALEX TISI is an active bookmaker and loanshark in Miami, whose telephone number is (954) 579-8224 (the "TISI PHONE").[15]

21. Between in or about June 2004 and in or about July 2004, CS-1 reported that IANNIELLO meets his crew and other organized crime members to discuss LCN business at restaurants in New York City. CS-1 also reported that IANNIELLO has a cellular telephone, the number for which is (954) 614-0823. According to CS-1, IANNIELLO regularly uses this cellular telephone to set up meetings and "sitdowns" between LCN members, where LCN business and LCN family hierarchy issues are discussed.

22. Another confidential source (hereinafter "CS-2") has been providing information to the FBI for more than five years. The FBI has independently corroborated, to the extent possible, the information that CS-2 has provided, and CS-2 has never been found to be untruthful in any material respect. CS-2 has provided information that has been used to support a number of other Title III applications and attendant renewals. CS-2's information

_____

ensures the association with, and protection of, the crew, capo, and LCN family.

[15]    Telephone records confirm that the TISI PHONE is subscribed to by ALEX TISI. Toll records show that the TISI PHONE called or was called by IANNIELLO's cellular phone seventeen times between in or about June 2004 and in or about August 2004. Those records also show that the TISI PHONE called or was called by CATENACCIO's cellular phone — (201) 988-3003 — thirty-two times between in or about June 2004 and in or about August 2004.

relevant to the instant application is summarized below and is based on CS-2's personal knowledge, as well as on conversations that CS-2 has had with members and associates of the Genovese Organized Crime Family.[16]

23. In or about July 2004, CS-2 reported that MATTHEW IANNIELLO is a longtime member of the Genovese Organized Crime Family. According to CS-2, IANNIELLO has financial interests in the waste hauling industry, owns an agency for exotic dancers, and earns money from loansharking. CS-2 stated that the following Genovese Organized Crime Family members, as well as other unknown individuals, are members of IANNIELLO's "crew:" PERRONE, ESPOSITO, Joseph Ida (the brother of James Ida), Thomas Cestaro, and Louis Cinquegrana, a/k/a "Louie Pigeons."[17]   Enrico Gentile, a/k/a "Red Hot," was also a member of the crew prior to his death in late 2003.[18]   Due to IANNIELLO's current elevated status within the Genovese Organized Crime Family, PERRONE is acting as the capo for IANNIELLO's crew.

24. From in or about July 2004 to in or about October

---

[16] In the past, CS-2 has engaged in various criminal activities with members and associates of LCN.

[17] On or about July 26, 2004, Cinquegrana pled guilty to conspiracy to make an extortionate extension of credit (loansharking) in the United States District Court for the Southern District of New York.

[18] According to CS-2, Gentile and ESPOSITO are known to have murdered fellow IANNIELLO crew member and Genovese Organized Crime Family soldier George Zappola, Sr. in 1982.   Zappola's head washed up on a beach in Long Island shortly after the murder.   To date, no one has ever been charged with Zappola's murder.

2004, CS-2 reported that IANNIELLO's crew earns its money from loansharking and gambling. CS-2 stated that PERRONE and ESPOSITO are particularly "big" loansharks and currently loan out large amounts of money. According to CS-2, PERRONE has the ability to make loans of many thousands of dollars at a time.

25. A third confidential source (hereinafter "CS-3") has been providing information to the FBI for approximately ten years. The FBI has independently corroborated, to the extent possible, the information that CS-3 has provided, and CS-3 has never been found to be untruthful in any material respect. CS-3 has provided information that has been used to support at least two Title III applications and one search warrant. CS-3's information relevant to the instant application is summarized below and is based on CS-3's personal knowledge, as well as on conversations that CS-3 has had with members and associates of the Genovese Organized Crime Family.[19]

26. In or about April 2003, CS-3 reported that IANNIELLO was the "Acting Boss" of the Genovese Organized Crime Family. In or about February 2004, CS-3 reported that, based upon a conversation held by members of the Genovese Organized Crime Family about twenty years ago, CS-3 believed that George Zappola, a member of IANNIELO's crew, was killed approximately twenty years ago by members of -the crew for violating the Genovese Family's ban on

---

[19] In the past, CS-3 has engaged in various criminal activities with members and associates of the Genovese LCN Family.

24

345

selling illegal drugs.[20]

27.  From in or about September 2004 through and including in or about October 2004, CS-3 reported that Genovese Organized Crime Family members IANNIELLO, ESPOSITO, and CATENACCIO were currently involved in earning money illicitly from the San Gennaro Feast in Little Italy, New York City.

---

[20] See ¶ 23, n.18, supra.

346

### D.  Don Peppe and THE TABLE

29.   PERRONE has historically used, and presently uses, his restaurant, Don Peppe, to host meetings with his crew, other members and associates of the Genovese Organized Crime Family, and members and associates of LCN families to discuss and conduct criminal activity.

30.   On a number of occasions between in or about November 2003 and in or about September 2004, FBI agents interviewed an individual who has admitted to being a made member

23

26

347

of LCN for over fifteen years (hereinafter referred to as "CS-4").[24] In the past, CS-4 has engaged in criminal activity with other members and associates of LCN Families in New York, including the Genovese Organized Crime Family. CS-4 is not currently facing criminal charges or imprisonment. CS-4 has not previously provided information to the FBI. The FBI, through surveillance and statements from other confidential sources and witnesses, has independently corroborated, to the extent possible, information that CS-4 has provided that is included in the instant application. CS-4's information relevant to the instant application is summarized below and is based on CS-4's personal knowledge.

31. In interviews with FBI agents, CS-4 stated that CIRO PERRONE is "part of [the Genovese Organized Crime Family]." CS-4 added that PERRONE is from Howard Beach, Queens, and owns a restaurant called Don Peppe, where PERRONE meets his crew. According to CS-4, PERRONE is still "doing business."[25] CS-4 added that "Zookie" (SALVATORE ESPOSITO) recently met PERRONE and others at Don Peppe on more than one occasion.

---

[24] CS-4 is not an FBI confidential informant, however, disclosing CS-4's identity would undoubtedly place CS-4 in grave physical danger because of the information provided by CS-4 in the instant application. CS-4 has stated more than once, "I could get killed for this."

[25] CS-4 did not specifically describe what CS-4 meant by "doing business." Based upon other confidential source statements, and taken in the colloquial context of members and associates of the LCN, the phrase is believed to mean that PERRONE is currently conducting the business of LCN: criminal activity.

32.    From in or about July 2004 to in or about October
2004, CS-2 reported that PERRONE owns a restaurant named Don Peppe
on Lefferts Boulevard in Queens, New York.  CS-2 reported that
PERRONE currently and regularly conducts criminal activity and
holds criminal conversations with other LCN members and associates
inside of Don Peppe at a large round table in the rear of the
restaurant (THE TABLE).  CS-2 stated that PERRONE uses THE TABLE,
and only THE TABLE, every time he is in Don Peppe.  Among other
things, PERRONE uses THE TABLE to make loans and receive payments
on those loans.

### E.    Physical Surveillance

33.    Based on information reported by, among others, CS-2
and CS-4, and as confirmed by numerous sessions of physical
surveillance that other Task Force members and I have conducted, I
learned that PERRONE regularly meets and converses with members and
associates of the Genovese and other LCN Families at the TABLE at
Don Peppe restaurant on Tuesdays and Thursdays between the
approximate times of 4:00 p.m. and 10:00 p.m.  PERRONE and others
hold these meetings at THE TABLE to conduct and discuss criminal
activity.

34.    Between on or about July 13, 2004 and on or about
October 14, 2004, I and other Task Force members have observed
PERRONE and other members and associates of the Genovese Organized
Crime Family and other LCN Families at Don Peppe on approximately

28

349

nineteen occasions.[26]

35.   On or about Tuesday, August 3, 2004, other Task Force members entered Don Peppe and made the following observations:   PERRONE was seated at the head of THE TABLE and remained at THE TABLE at all times while he was in the restaurant. Over the course of approximately three and one-half hours, about twelve other white males ate dinner and engaged in conversations with PERRONE and others at THE TABLE.   During that time, some of the individuals repeatedly changed seats to engage in quiet conversation with each other and apparently to avoid having to speak too loudly across THE TABLE.   Nonetheless, the name "Zookie" (the alias for SALVATORE ESPOSITO) and the word "cellblock" were overheard by the Task Force members.   Throughout, PERRONE remained in the same seat at THE TABLE, and the Task Force members observed a number of intentionally quiet conversations taking place at THE TABLE.

36.   The following SUBJECTS, in addition to numerous other unidentified individuals, have been observed by Task Force members entering and exiting Don Peppe when PERRONE was inside the restaurant on or about the following dates: ANTHONY CONIGLIARO (Genovese Organized Crime Family soldier), August 26, 2004, September 21 & 23, 2004, and October 7, 2004; ONOFRIO MACCHIO (Genovese Organized Crime Family soldier), July 13, 2004, August

---

[26]   JOHN YANNUCCI, PERRONE's driver, has been with PERRONE on every occasion at Don Peppe.

31, 2004, September 28, 2004, and October 5, 2004; ANTHONY ANTICO
(Geneovese Organized Crime Family capo), August 3, 2004; JOHN
GIGLIO (Genovese Organized Crime Family soldier), August 3, 2004;
JOHN A. BRESCIO (Genovese Organized Crime Family soldier), August
3, 2004; LOUIS CALO (Genovese Organized Crime Family associate),
August 19, 2004, and September 9, 2004; RALPH SCOPO, JR. (Colombo
Organized Crime Family soldier), July 13 and 27, 2004, September 2,
21, and 28, 2004, and October 5, 2004; FRANK STURIANO (Colombo
Organized Crime Family associate), September 28, 2004, and October
5, 2004; GEORGE REMINI (Gambino Organized Crime Family soldier),
July 29, 2004; MICHAEL CORCIONE (Luchese Organized Crime Family
acting capo), August 17, 2004, September 21, 2004, and October 12,
2004; FRANK CATENNACIO (Genovese Organized Crime Family soldier),
September 23, 2004; and JOHN BAUDANZA (Luchese Organized Crime
Family soldier), August 17, 2004, and September 21, 2004.

    37.   I and other Task Force members observed MATTHEW
IANNIELLO and SALVATORE ESPOSITO at Don Peppe on or about the
following dates: IANNIELLO (July 29, 2004, August 26, 2004, and
September 16, 2004),[27] and ESPOSITO (July 15 and 29, 2004; August
3 and 26, 2004; and September 16, 2004).  On or about August 26,
2004, at approximately 8:30 p.m., from inside Don Peppe restaurant,
I observed IANNIELLO, ESPOSITO and Conrad Ianniello (a relative of

---

    [27] On or about July 15, 2004, a vehicle registered to
Matthew J. Ianniello  (date of birth October 7, 1966),
IANNIELLO's son, a silver Mercedes with New York license plate
CTT2720, was observed parked in front of Don Peppe.  Task Force
members have seen IANNIELLO being driven by his son on prior
occasions.

MATTHEW IANNIELLO and a Genovese Organized Crime Family soldier or associate) engaged in a quiet conversation alone at THE TABLE. I also saw other white males — who had been earlier seated at THE TABLE with IANNIELLO and ESPOSITO — waiting outside of DON PEPPE until the three men finished their conversation at THE TABLE. Moreover, on or about September 16, 2004, another Task Force member observed IANNIELLO, PERRONE, ESPOSITO, and other individuals seated at THE TABLE and further observed, at one point, ESPOSITO get up from his seat, walk over to IANNIELLO, and lean over and talk quietly into IANNIELLO's ear.

## F.   Unavailability of Alternative Investigative Techniques

38.   For the following reasons, normal investigative techniques have been tried without success, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ:

(a)   The confidential sources of information described in this affidavit do not know all of the details of the SUBJECTS' varied and long-running criminal conduct that are necessary to ensure a successful prosecution of the SUBJECTS. CS-1, CS-2, and CS-3 are not privy to the full scope of the illegal activities being discussed or engaged in by the SUBJECTS. CS-4 is not a confidential source or cooperating witness for the FBI. Moreover, CS-1, CS-2, and CS-3 are not willing to wear recording devices, as they are each fearful for their safety. In addition, while they are each knowledgeable about certain aspects of the

31

SUBJECTS' criminal activities, neither CS-1, CS-2, nor CS-3 are completely aware of the full scope of the SUBJECTS' criminal activities or their discussions regarding the nature, structure and operations of the Genovese Family that occur at THE TABLE. Needless to say, it would be extremely dangerous for any of the confidential sources to initiate discussions about such topics with the SUBJECTS. Any such attempts would undoubtedly cause the SUBJECTS to suspect the confidential sources and to cease having any relevant discussions in the presence of the sources. Finally, no additional sources of information have been identified during the course of this investigation.

(b)  Physical surveillance of the SUBJECTS provides only limited evidence as to their illegal activities. Thus, the physical surveillance in this investigation has been helpful in placing people with each other and at THE TABLE, but has provided limited evidence of the purpose of the meetings or the content of their conversations. Moreover, physical surveillance can only have limited success when the targets of the surveillance are extremely conscious of law enforcement surveillance and take steps to evade the surveillance. Finally, surveillance of THE TABLE is especially difficult because THE TABLE cannot be seen from a public area outside Don Peppe restaurant, [28] and repeated physical surveillance from inside the restaurant would attract the SUBJECTS'

---

[28]    Thus, a pole camera placed outside of Don Peppe restaurant will reveal no more than the fact that some individuals entered the restaurant around the same time.

32

suspicion.  The SUBJECTS are all long-time members and associates of LCN Families and, as such, are sensitive to law enforcement scrutiny.  This is demonstrated by, among other things, the way in which the SUBJECTS speak quietly when they meet at THE TABLE and regularly change seats so that they do not have to speak loudly to each other.

The information that will be gained from electronic surveillance will assist in establishing the roles of individuals associated together, the nature of their activities, the location of physical evidence, and the like.  In addition, with the knowledge provided beforehand by electronic surveillance that a meeting or action is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thereby minimizing the risks of discovery inherent in following the SUBJECTS or remaining in the vicinity of target locations for long periods of time.  In addition, the interception of oral communications at THE TABLE will provide crucial direct evidence of the substance of conversations and activities that occur at THE TABLE.

(c)  Use of a Federal Grand Jury, as discussed with the Assistant United States Attorney submitting the application herewith, does not, at this time, appear to be a promising method of investigation.  The witnesses who could chiefly provide evidence to the Grand Jury as to the illegal activities and the identities of the racketeering enterprise members are the identified members of the racketeering enterprise themselves.  All of these individu-

33

354

als face prosecution; it is unlikely, therefore, that any of them
would testify voluntarily.  Nor would it be desirable at this time
to seek immunity for any of the known members of the racketeering
enterprise in order to compel their testimony.  Immunizing them
could foreclose the possible prosecution of the most culpable
persons, and would thwart the public policy that they be held
accountable for their illegal activities.  Moreover, immunizing the
witnesses could not ensure the production of truthful testimony,
and it is likely that these individuals would refuse to testify in
contempt of court, particularly in view of their solid ties to LCN.
In any event, the granting of immunity is premature until the full
scope of the illegal activities described above is known.  The
issuance of grand jury subpoenas to other individuals likewise
would not likely lead to the discovery of critical information and
undoubtedly would alert members of the racketeering enterprise to
the existence and scope of the investigation, possibly causing the
SUBJECTS to flee or to go into hiding, destroy evidence, threaten
known or suspected Government agents or informants, or otherwise
adversely affect the Government's investigation.

     (d)  Applications for search warrants would appear
to be premature at this stage of the investigation because it is
not known with certainty where the SUBJECTS conduct other meetings
and direct their racketeering and extortionate activities.  In
addition, the results of searches would not be likely to identify
unknown enterprise members or to describe fully the nature and
extent of the illegal activities of the SUBJECTS.  Moreover, a

search would inevitably tip-off known and unknown targets of this
investigation.

     (e)   Based on my experience, an undercover operation
is not feasible due, in part, to the unwillingness of the SUBJECTS
to deal extensively with outsiders who are not members or
associates of LCN and are neither friends nor acquaintances of
Genovese Family members or associates. This is especially true at
THE TABLE, where high-level meetings of LCN officials appear to
take place; no undercover officer could penetrate LCN at that high
of a level in the near future. It also would cast suspicion upon
-- and consequently, endanger -- any LCN informant who might
attempt to introduce into the organization an outsider, whom the
SUBJECTS might suspect is an undercover agent. As a result, it
would be extremely difficult, and dangerous, to attempt to
penetrate the organization with an undercover agent.

     (f)   Interviews of the SUBJECTS would not appear to
be a promising avenue of investigation. Based on my experience and
the experience of other special agents of the FBI, I believe that
any interviews of the SUBJECTS would not be fruitful. Moreover,
because of their culpability, there is no reason for the SUBJECTS
to provide information unless confronted with facts that would
encourage them to provide truthful information, or they might
invoke their privilege against self-incrimination. Interviews
would also place the SUSPECTS on notice of the scope of the
investigation. Interviews of victims of the extortions and
loansharking activity would not likely be fruitful because many of

35

356

them have not yet been identified.  Moreover, many of the business owners who may be able to provide information appear to be confederates of the SUBJECTS and, because of fear of reprisals from the SUBJECTS, would not be likely to provide truthful information, and the interviews may result in the disclosure to the SUBJECTS of the existence of the investigation.

(g)   To the extent telephones are used by the SUBJECTS, telephone toll records and pen register devices show only that a conversation occurred over two particular phones.  While helpful, those records do not reveal the topics discussed, the contents of the communications, or the identities of the actual participants.

357

39.   For the above reasons, it is believed that the only means by which the full scope of the SUBJECTS' ongoing criminal activities can be ascertained is by the interception of the SUBJECTS' oral communications and visual non-verbal conduct, as applied for herewith.   Employment of closed-circuit television cameras at or around THE TABLE will provide additional evidence of criminal activity and enable the monitoring agents to identify the participants to conversations, who are the SUBJECTS of the requested order to intercept oral communications.

### III.   CONCLUSION

**A.**   **Personnel**

40.   As noted above, this case is being investigated by the Joint Organized Crime Task Force of the NYPD and FBI.   It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised by Special Agents of the FBI and Special Federal Officers.

**B.**   **Minimization**

41.   All interceptions of oral communications occurring at or around THE TABLE will be minimized in accordance with Chapter 119 of Title 18, United States Code.   The Special Agents of the FBI

37

and Special Federal Officers who are to carry out the requested interceptions of oral communications will be instructed concerning the steps that they should take to minimize the interceptions. Any interception will cease when it is determined that the monitored conversation is not criminal in nature or that none of the named interceptees or other co-conspirators or co-racketeers is a party to the conversation. The agents and officers will be permitted to spot check to determine whether a minimized conversation has turned criminal in nature. Moreover, additional minimization will be accomplished by conducting interceptions of communications only on Tuesdays and Thursdays, between the approximate times of 4:00 p.m. and 10:00 p.m., when physical surveillance has revealed that the SUBJECTS meet at Don Peppe restaurant, unless the investigation establishes that the SUBJECTS meet at THE TABLE at other times, in which case the Court will be notified promptly.

42. It is requested that the order authorizing interception of oral communications provide that, if necessary, translators be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications. Certain of the SUBJECTS are expected to communicate with each other in the Italian language. It may therefore be necessary to secure the services of translators in order to assist Task Force members in monitoring and translating the intercepted communications. All such translators will be under contract to the FBI and will be directly supervised by the FBI and deputized law enforcement officers of the NYPD. It is further requested, pursuant to Title

38

18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

### C. **Period of Interception**

43.    The  information set forth in this affidavit establishes, among other things, probable cause to believe that: MATTHEW IANNIELLO, a/k/a "Matty the Horse;" CIRO PERRONE; SALVATORE ESPOSITO, a/k/a "Zookie;" FRANK CATENACCIO, a/k/a "Frankie," a/k/a "Frankie Cee;" JOHN YANNUCCI; ANTHONY CONIGLIARO; ONOFRIO MACCHIO; ANTHONY ANTICO, a/k/a "Tico;" JOHN GIGLIO, a/k/a "John Digiglio;" JOHN A. BRESCIO, a/k/a "Johnny Hollywood;" LOUIS CALO; RALPH SCOPO, JR.; FRANK STURIANO; GEORGE REMINI; MICHAEL CORCIONE; ALEX TISI; BOBBY (LNU); and JOHN BAUDANZA and others as yet unknown, are discussing and engaging in criminal activity at and around THE TABLE.

44.    IT IS HEREBY REQUESTED that orders be issued authorizing Special Agents of the FBI and Special Federal Officers to intercept oral communications and visual non-verbal conduct occurring at and around THE TABLE concerning the affairs of the enterprise described herein and the SUBJECTS' commission of the above offenses. Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the object

of this request, it is requested that the Court's orders authorizing the interception of oral communications and visual non-verbal conduct not be required to terminate automatically when the types of communications described above have first been obtained, but be permitted to continue until all oral communications and visual non-verbal conduct are intercepted that reveal fully the manner in which the SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth in ¶ 8, supra, or for a period of thirty (30) days, whichever is earlier. Pursuant to 18 U.S.C. § 2518(5), it is requested that such thirty (30) day period begin on the earlier of the day on which an investigative or law enforcement officer first begins to conduct an interception under the Court's orders or ten (10) days after the orders are entered.

45. IT IS HEREBY REQUESTED that Special Agents of the FBI and employees of the FBI possessing required technical expertise be authorized to enter Don Peppe restaurant and the areas adjacent to and around THE TABLE and Don Peppe restaurant covertly, surreptitiously, and by breaking and entering, for the purpose of installing, maintaining and removing such surveillance equipment deemed necessary by the FBI to intercept and record oral communications and visual non-verbal conduct occurring at and around THE

40

361

TABLE.  The Court will be advised as soon as practicable after each such entry.

_____
JOHN PENZA
Special Agent
Federal Bureau of Investigation


Sworn to before me this
2   day of October, 2004

_____
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

41

362